14 CV 687

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RECEIVED
FEB 03 2014
U.S.D.C. S.D. N.Y.
CASHIERS

--------------------------------------------x

KATHI W. THORBJORNSEN,
derivatively on behalf of
FAB UNIVERSAL CORPORATION,

           Plaintiff,

     vs.

CHRISTOPHER J. SPENCER, ZHANG
HONGCHENG, J. GREGORY SMITH,
DOUGLAS POLINSKY, DENIS
YEVSTIFEYEV, GU JIANFEN,
JAMES B. ROGERS, JR., and
JOHN LAWRENCE BUSSHAUS,

           Defendants,

    -and-

FAB UNIVERSAL COROPORATION,

          Nominal Defendant.

--------------------------------------------x

Case No.:

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

**Jury Trial Demanded**

Plaintiff Kathi W. Thorbjornsen, by her undersigned attorneys, submits this Verified Shareholder Derivative Complaint in the name of and on behalf of nominal defendant FAB Universal Corporation ("FAB Universal" or the "Company") against certain directors and officers of FAB Universal named herein. Plaintiff bases her allegations on personal knowledge as to her own acts, and on information and belief as to all other allegations, based on investigation by counsel, including: (a) review and analysis of public filings made by FAB Universal and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and

postings on FAB Universal's websites concerning the Company's public statements; and (d) review of other publicly available information concerning FAB Universal and other persons.

## INTRODUCTION

1.      FAB Universal (formerly known as Wizzard Software Corporation) purports to be a worldwide provider of digital entertainment products.   However, substantially all of the Company's revenues and income is attributable to its Chinese subsidiary, Digital Entertainment International Ltd. ("DEI").   The core business of DEI, in turn, is the licensing of "Intelligent Media Kiosks" in the People's Republic of China ("PRC" or "China").   Using such a "kiosk," a consumer supposedly can download a legitimate copy of a copyrighted song or current release movie onto his or her portable digital device.   Under Defendants' direction, the Company has claimed that there are over 16,000 such "kiosks" currently up and running in China.

2.      In reality, however, despite the artful labeling, the "kiosks" licensed by FAB Universal in China are often little more than storefronts where a clerk will download a movie or other digital file onto a customer's device directly from the clerk's laptop or desktop computer. In reality, the content so downloaded is not a legitimate copy of otherwise copyright-protected programming, but in fact is often a pirated version, consisting of a crude copy (often digitally recorded in a live movie theater) that is then electronically duplicated and disseminated, weeks or months before the official release date of such programming in digital format.   In reality, there are, at most, a couple of thousand kiosks functioning in China—few, if any, of which are entirely functional.

3.      Notwithstanding this actual state of affairs, Defendants caused FAB Universal to misstate the true circumstances of its "Intelligent Media Kiosks" in China throughout the relevant period.   In addition, Defendants concealed from shareholders the fact that another of its

Chinese subsidiaries had issued RMB 100 million ($16.4 million) worth of bonds to Chinese investors in April 2013—materially and negatively impacting FAB Universal's balance sheet, income statement, and cash flows. When caught in this concealment, Defendants were obliged to issue a statement that the two most recent quarters' financial statements could no longer be relied upon, and to revise and reissue those financial statements—at great expense and loss of credibility for the Company. Public trading of the Company's common stock has been halted.

4.      When, in mid-November 2013, the market learned of Defendants' false and misleading statements concerning the pirated video content, the number of "kiosks" deployed, and the Chinese bond offering, the Company's stock price plummeted. Despite trading at a high of $9.70 per share on September 25, 2013, the stock fell to $5.25 per share on November 14, 2013—the same day that Alfred Little, an investment website that monitors and analyzes PRC-based companies, published a report revealing the fraudulent nature of the Company's Chinese business. The Alfred Little report revealed, among other things, that the vast majority of movies offered for download in China were patently pirated (obvious both from the poor, "filmed" quality of the videos and from the fact that they featured "file-creation" dates earlier than the official digital release dates of the movies set by the studios which produced them. Moreover, based on an investigative survey of kiosk manufacturers listed by FAB Universal, only approximately 1,600 kiosks had ever been delivered to DEI in China.

5.      As for the secret bond offering in China, on November 14, 2013, GeoInvesting, another respected investment website, issued a report revealing the existence of this offering to U.S. investors for the first time and establishing that it had never been disclosed to shareholders in FAB Universal's SEC filings, press releases, or otherwise. However, the existence of the bond offering was evident from a public announcement on the Shenzhen Stock Exchange on

August 2, 2013 and by references to the bond offering buried in the reports of certain other financial institutions. Following this revelation, FAB Universal's stock price dropped $0.89 per share to close at $4.40 per share on November 17, 2013, on exceptionally high volume.

6.     Aside from wiping out the holdings of hundreds of thousands of shareholders such as Plaintiff, Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgments or settlements in multiple shareholder class action lawsuits, including three action filed in this Court, *Simmons v. Spencer et al.*, No. 13-cv-8216 (S.D.N.Y. filed Nov. 18, 2013); *Stubblefield v. FAB Universal Corp. et al.*, No. 13-cv-8499 (S.D.N.Y. filed Nov. 27, 2013); and *Cox v. FAB Universal Corp et al.*, No. 13-cv-8716 (S.D.N.Y. filed Dec. 9, 2013) (the "Securities Class Actions").

7.     As shown in its current share price, and the fact the shares have not traded since late November due to a stock exchange-imposed trading "halt," at the hands of Defendants FAB Universal's reputation for honesty and integrity has been ruined. The Company will face increased costs of borrowing or raising equity capital in the future and will trade at a "liar's discount" in the public stock market for the foreseeable future.

8.     To make matter worse, Defendants Spencer, Polinsky, Smith, Yefstifeyev, and Busshaus took advantage of the concealment of the true facts about the Company, and among themselves sold approximately $5.08 million of Company stock based on material non-public information during the last year alone. A chart of these insider trades is attached hereto as Exhibit A. In so doing, they misappropriated confidential information of FAB Universal and must account for all profits on the ill-gotten proceeds of these sales.

9.     In this shareholder derivative action, Plaintiff, on behalf of FAB Universal and its shareholders, seeks to hold Defendants fully accountable for the misconduct outlined above and

detailed herein. The claims asserted herein include breaches of Defendants' fiduciary duties of loyalty, due care, good faith, independence, candor and full disclosure to shareholders; misappropriation of material, non-public information of FAB Universal by Defendants Spencer, Smith, Polinsky, Yevstifeyev, and Busshaus; and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder against Defendants Spencer and Polinsky.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) or, alternatively, pursuant to 28 U.S.C. § 1332 (diversity of citizenship) in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

11.    The Court has personal jurisdiction over each of the Defendants and Nominal Defendant FAB Universal because each is either a corporation that conducts business in and maintains operations in this District or an individual with sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Moreover, each Defendant has had extensive contacts with New York as a director and/or officer of FAB Universal or otherwise, which makes the exercise of personal jurisdiction over them proper.

12.    Venue is proper in this Court because FAB Universal has a substantial presence in New York.

## PARTIES

### Plaintiff

13.     Plaintiff Kathi W. Thorbjornsen, a citizen of Virginia, is a current shareholder of FAB Universal and has been a shareholder at relevant times to the claims asserted herein.

### Nominal Defendant

14.     Nominal Defendant FAB Universal is a corporation organized and existing under the laws of the State of Colorado with its principal place of business at 5001 Baum Boulevard, Suite 770, Pittsburgh, Pennsylvania 15213.  The stock of FAB Universal trades under the symbol FU.

### Defendants

15.     Defendant Christopher J. Spencer ("Spencer"), 44, has been the Chief Executive Officer and President of FAB Universal since February 2001 and a member of the Company's Board of Directors since 1995.  Spencer received salary, bonus, stock and option awards, incentive pay, and other compensation totaling $1,337,353 from FAB Universal in 2012.  He owns 2.1% of the issued and outstanding common stock of the Company.  In 2011, the Company engaged in transactions with Survival Spanish—a company owned by Spencer's brother, David Spencer—to air commercials for its products and services (as reported in the Company's 2012 proxy statement).  During the relevant period, Spencer sold 320,830 shares of his FAB Universal common stock for proceeds of $2.03 million, as detailed in Exhibit A hereto.  Spencer is a citizen of Florida.

16.     Defendant Zhang Hongcheng ("Hongcheng"), 43, has been the Chairman of the Company's Board of Directors since September 2012.  HongCheng is a nominee of the Company's controlling shareholder, Universal Entertainment Group Limited, a British Virgin

Islands company ("UEG"). Hongcheng owns 11.2% of the issued and outstanding common stock of FAB Universal. HongCheng is a citizen of PRC.

17.     J. Gregory Smith ("Smith"), 43, has been a director since October 2007. Smith is a member of the Audit Committee, the Compensation Committee, and the Nominating Committee of the Board of Directors. In 2012, Smith received director's fees and stock awards totaling $391,000 from FAB Universal. During the relevant period, Smith sold 29,500 shares of his FAB Universal common stock for proceeds of $123,919, as detailed in Exhibit A hereto. Smith is a citizen of Maryland.

18.     Douglas Polinsky ("Polinsky"), 53, has been a director since October 2007. Polinsky is the Chair of the Audit Committee, the Chair of the Compensation Committee, and the Chair of the Nominating Committee of the Board of Directors. In 2012, Polinsky received director's fees and stock awards totaling $391,000 from FAB Universal. During the relevant period, Polinsky sold 108,426 shares of his FAB Universal common stock for proceeds of $1.0 million, as detailed in Exhibit A hereto. Polinsky is a citizen of Minnesota.

19.     Denis Yevstifeyev ("Yevstifeyev"), 31, has been a director since October 2007. Yevstifeyev is a member of the Audit Committee, the Compensation Committee, and the Nominating Committee of the Board of Directors. In 2012, Yevstifeyev received director's fees and stock awards totaling $391,000 from FAB Universal. During the relevant period, Yevstifeyev sold 112,500 shares of his FAB Universal common stock for proceeds of $686,350, as detailed in Exhibit A hereto. Yevstifeyev is a citizen of Pennsylvania.

20.     Gu Jianfen ("Jianfen"), 77, has been a director since September 2012. Jianfen is a nominee of the Company's controlling shareholder, UEG. Jianfen is a citizen of the PRC.

21.     James B. Rogers, Jr. ("Rogers"), 70, has been a director since June 2013.  Upon becoming director, Rogers received an award of 24,000 shares of FU common stock (currently worth over $72,000) and options to purchase 250,000 shares of common stock at a price of $3.52, to vest over a 12-month period.  Rogers is a citizen of New York.

22.     John Lawrence Busshaus ("Busshaus"), 51, is the Chief Financial Officer of FAB Universal.  During the relevant period, Busshaus sold 287,660 shares of his FAB Universal common stock for proceeds of $1.23 million, as detailed in Exhibit A hereto.  Busshaus is a citizen of Pennsylvania.

23.     Defendants Spencer, Hongcheng, Smith, Polinsky, Yevstifeyev, Jianfen, and Rogers are referred to herein as the "Directors."

24.     The Directors and Busshaus are referred to herein as "Defendants."

**Other Persons**

25.     UEG is the controlling shareholder of FAB Universal.  UEG owns 49% of the 10,702,309 fully-diluted shares of the Company that currently are outstanding.  UEG also owns preferred stock in FAB Universal which, upon the occurrence of certain milestones will convert into common stock giving it an additional 27,661,940 shares, or at least three-quarters of the total common stock issued and outstanding as of the completion of the conversions.

## GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS

26.     The Defendants had stringent fiduciary obligations to FAB Universal and its shareholders.

27.     By reason of their positions as officers, directors and/or fiduciaries of FAB Universal and because of their ability to control the business and corporate affairs of FAB Universal, the Defendants owed FAB Universal and its shareholders fiduciary obligations of

loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage FAB Universal in a fair, just, honest and equitable manner. The Defendants were and are required to act in furtherance of the best interests of FAB Universal and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

28.      Each director and officer of the Company owes to FAB Universal and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company.

29.      The Defendants, because of their positions of control and authority as directors and/or officers of FAB Universal, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with, each of the Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of FAB Universal and its assets.

30.      At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of FAB Universal, and was at all times acting within the course and scope of such agency.  To discharge their duties, the officers and directors of FAB Universal were required to exercise reasonable and prudent supervision over the management, policies, practices

and controls of the operational affairs of the Company.  By virtue of such duties, the officers and directors of FAB Universal were required to, among other things:

- conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

- properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

- ensure that there were sufficient checks and balances in FAB Universal's accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of revenue and/or income;

- ensure that no inaccurate financial information about FAB Universal was released to the public that would tend to artificially inflate FAB Universal's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed; and

10

- ensure that no usurpation of corporate opportunities took place by Company insiders and directors, and that the Company's interests were placed before those of any individual director.

31.    Each of the Defendants, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, due care, disclosure, candor, and oversight in the management and administration of the affairs of the Company.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of FAB Universal, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.  The Defendants were aware, or should have been aware, that those violations, absences of good faith, and/or the reckless disregard of duties posed a risk of serious injury to the Company.   The conduct of the Defendants who were also officers and/or directors of the Company has been ratified by the remaining Defendants.

32.    Because of their positions with the Company, and their access to material non-public information available to them but not to the public, FAB Universal, through the Defendants, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

## SPECIFIC FIDUCIARY DUTIES OF THE DEFENDANTS

33.    Aside from their legally imposed duties as officers and/or directors of a publicly traded company organized under Colorado law, Defendants were also subject to particularized duties pursuant to specific policies in effect at FAB Universal.

**Duties Arising from FAB Universal's Code of Business Conduct and Ethics**

34.     FAB Universal's Code of Business Conduct and Ethics (the "Code") imposes substantial duties upon all of FAB Universal's Officers, Directors, and Employees. The Code states, in pertinent part:

> This Code of Business Conduct and Ethics (the Code ) sets forth legal and ethical standards of conduct for directors, officers and employees of Wizzard Software Corporation and its subsidiaries (the Company ).  This Code is intended to deter wrongdoing and to promote the conduct of all Company business in accordance with high standards of integrity and in compliance with all applicable laws and regulations.  This Code applies to the Company and all of its subsidiaries and other business entities controlled by it worldwide.

> \* \* \*

> **Compliance with Laws, Rules and Regulations**

> The Company requires that all employees, officers and directors *comply with all laws, rules and regulations applicable to the Company wherever it does business.* You are expected to be familiar with the laws, rules and regulations applicable to your place of work, and such additional laws, rules and regulations which may apply and of which the Company gives you written notice.

> \* \* \*

> **Conflicts of Interest**

> Employees, officers and directors must act in the best interests of the Company. You must refrain from engaging in any activity or having a personal interest that presents a conflict of interest.  A conflict of interest occurs when your personal interest interferes, or appears to interfere, with the interests of the Company. A conflict of interest can arise whenever you, as an officer, director or employee, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively.

> \* \* \*

> Directors must not … directly supervise, review or influence the performance evaluation or compensation of a member of his or her Immediate Family.

> \* \* \*

"Immediate Family" means a Close Relative and a parent, sibling, child (including stepchild or foster child), mother- or father-in-law, son- or daughter-in-law, or brother- or sister-in-law.

\* \* \*

### Insider Trading

It is usually *illegal to buy or sell securities using material information not available to the public.* Persons who give such undisclosed "inside" information to others may be as liable as persons who trade securities while possessing such information. Securities laws may be violated if you, or any relatives or friends trade in securities of the Company, or any of its customers or vendors, while possessing inside information or unpublished knowledge. If you are uncertain about the constraints on your purchase or sale of any Company securities or the securities of any other company that you are familiar with by virtue of your relationship with the Company, you should consult with the Company's General Counsel before making any such purchase or sale.

\* \* \*

### Honest and Ethical Conduct and Fair Dealing

Employees, officers and directors should endeavor to *deal honestly, ethically and fairly with the Company's suppliers, customers, competitors and employees. Statements regarding the Company's products and services must not be untrue, misleading, deceptive or fraudulent.* You must not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

\* \* \*

### Accuracy of Books and Records and Public Reports

Employees, officers and directors must *honestly and accurately report all business transactions.* You are responsible for the material accuracy of your records and reports. Accurate record keeping and reporting are essential to the Company's ability to meet legal and regulatory obligations, including specific obligations relating to the Company's transactions with governments and governmental entities.

*All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record in all material respects. The financial statements of the Company shall conform in all material respects to generally accepted accounting principles and the Company's accounting policies. No*

*undisclosed or unrecorded account shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason*, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation. *It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the Securities and Exchange Commission and in other public communications.* [Emphases added.]

### Duties Arising from the Charter of the Audit Committee

35.     Defendants Polinsky, Smith, and Yevstifeyev were members of the Audit Committee during the relevant period. As such, they had duties to assist the Board, among other things, in its oversight of:

- the integrity of the financial statements of the Company;

- the qualifications, independence and performance of the Company's independent auditor;

- the performance of the Company's internal audit function; and

- compliance by the Company with legal and regulatory requirements.

36.     In addition, the charter of the Audit Committee contains specific areas of responsibility for members of the Audit Committee, including the duties to:

- "assist Board oversight of . . . management's responsibilities to assure that there is in place an effective system of controls reasonably designed to . . . safeguard the assets and income of the corporation[,] assure the integrity of the corporation's financial statements[, and] maintain compliance with the corporation's ethical standards, policies, plans and procedures, and with laws and regulations";

- "[r]eceive periodic presentations from management and the independent registered public accounting firm on the identification and resolution status of material weaknesses and reportable conditions in the internal control

environment, including any significant deficiencies in the design or operation of internal controls that could adversely affect the corporation's ability to record, process, summarize and report financial data, and on any fraud, whether or not material, that involves management or other employees who have a significant role in the corporation's internal controls"; and

• "[r]eview and discuss with management, the independent registered public accounting firm, and receive a timely report from the independent registered public accounting firm with respect to, any significant accounting, income tax, financial, reporting policies, issues or judgments made in connection with the preparation, or audit, of the corporation's financial statements and other financial or informational reports, including any major issues regarding or significant changes in the corporation's selection or application of accounting principles, the development, selection and disclosure of critical accounting estimates or judgments (including reserves), an analysis of the effect of any alternative assumptions, estimates or GAAP methods on the financial statements, and the effect of regulatory examinations or any regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements, and obtain from the independent registered public accounting firm a timely report relating to any material communications between the independent registered public accounting firm and management, such as any "management" letter or schedule of unadjusted differences."

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Defendants also aided and abetted, and/or assisted, each other in breach of their respective duties.

38.     During all times pertinent hereto, the Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the material, non-public information detailed herein concerning FAB Universal's business model, financial results, and projected results.

39.     The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants' violations of state law, including breaches of fiduciary duty, abuse of control; and to conceal adverse information concerning the Company's true financial position while selling off massive stakes in the company.

40.     The Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by purposefully or recklessly releasing improper statements on the Company's behalf. Because the actions described herein occurred under the Board's authority, each of the Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the

primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

42.     According to its public filings with the SEC, FAB Universal operates in three segments, Wholesale, Retail, and Digital Media Services.   The Wholesale segment engages primarily in the sale of audio-visual products as well as books and magazines to retail businesses. The Retail segment conducts its business through retail stores, selling copyright protected audio and video products, including CDs, VCDs, DVDs, books, magazines, and portable electronic devices.   The Digital Media Services segment "licenses multi-year programs for the FAB brand and business model."   It also includes the "revenue share for advertising on kiosks, and includes the services provided by our podcast hosting, content management tools and advertising services."

43.     The Company derives substantially all of its revenue and income from the operations of DEI in China.   These operations are undertaken by various companies that are subsidiaries of DEI, a Hong Kong-incorporated company that is itself a subsidiary of FAB Universal.

44.     It is DEI which distributes the vast bulk of the Company's digital entertainment files, through so-called "Intelligent Media Kiosks."   Defendants describe these "kiosks" as follows:

> FAB Intelligent Media Kiosks, based on 61 proprietary national intellectual property rights, are ATM style terminals where consumers can download copyrighted music, video games, ringtones, digital books and movies directly to their cell phones, memory sticks or other mobile storage devices.  FAB Media Kiosks can also run video ads on the high-tech LCD screens and accept payments for utility bills, metro cards, and credit card bills.

45.     Throughout the relevant period, Defendants caused the Company consistently to emphasize the breadth and accessibility of its digital entertainment sales in China through the "kiosks." Described as being "located in high-traffic areas of office buildings, shopping malls, retail stores and airports, are self-service terminals that provide a range of entertainment and consumer applications," the kiosks were represented by Defendants to number in the tens of thousands. Defendants also caused the Company to emphasize the claim that the content available for download from these "kiosks" was legitimately obtained, fully licensed, not pirated, and in conformity with all applicable copyright protections.

46.     On June 15, 2012, Defendants caused the Company to issue its Form 14A proxy statement for 2012 ("2012 Proxy Statement") claiming that DEI had installed 3,954 kiosks in Beijing, China alone. The 2012 Proxy Statement was executed by Defendant Spencer.

47.     On July 24, 2012, Defendants caused the Company (then known as Wizzard Software) to issue a press release emphasizing the fully legitimate, and non-pirated, nature of its downloadable video offerings in China:

> PITTSBURGH--(BUSINESS WIRE)—Wizzard Media (NYSE MKT: WZE), the leading digital media podcast network, today announced that FAB was awarded the CICE Golden Copyright Enterprise Award for their leading efforts in adhering to the promotion of copyright content and the protection of intellectual property.
>
> During the Fourth China International Copyright Expo (CICE) recently held in Beijing, FAB, one of the largest exhibitors and sponsors, reached copyright agreements with three well-known content publishers and five content producers. The CICE Expo attracted industry associations and copyrighted content providers from 185 countries.
>
> *"Insisting on the protection of copyrights and resisting piracy is the core belief to which FAB always adheres," said Mr. Zhang Hongcheng, Founder and Chairman of FAB.* "Making the FAB Intelligent Media Kiosks a copyright content distribution platform and providing users with easy access to high-quality digital content is the top business priority of FAB." FAB has a large library of copyrighted digital content including digital movies, TV shows, video, ebooks,

games, music and strategic relationships with more than a hundred digital content providers across Asia.

In February 2010, FAB led the way in joining forces with more than 100 media companies and more than 100 performers and film producers for the purpose of enhancing copyright protection in China. *FAB co-sponsored the first Chinese anti-piracy organization, the National Anti-Piracy Association and Mr. Zhang Hongcheng was elected as the founding Chairman.* In December, 2010, FAB was named the Most Influential Enterprise of China's Copyright Industry by the Copyright Society of China. [Emphases added.]

48.     On November 14, 2012, Defendants caused the Company to issue its third-quarter

Form 10-Q with the SEC stating that DEI had installed over 11,000 kiosks in China.  The Form

10-Q stated in relevant part:

In 2008, FAB was granted a license by China's Ministry of Commerce to license its business model that has been well received by entrepreneurs throughout the country.  FAB has quickly grown its nationwide business network through its license and regional agent programs and to date has expanded to *40 cities* with around 7,000 licensees and an *installed* network count approaching *11,000 Intelligent Media Kiosks*.

* * *

FAB kiosk is an innovative self-service vending kiosk designed and launched by FAB in 2008.  The kiosks target the millions of mobile and portable device users combing interactive touch screen and LED display with a large selection of copyrighted content such as music, movies and games.  The content is contained on internal hard drives within each terminal *thereby eliminating bandwidth download problems associated with the internet and providing content owners with a secure closed system for digital file protection and accurate transparent accounting.*  The terminals are updated and monitored via web-linked electron communications.  There are thousands of *licensed* digital entertainment content items in each kiosk, such as music, movie and TV episodes, which allows the customer to play or download to their portable device or memory card with payment by cash, FAB membership card or ATM card.  FAB has *deployed over 11,000 kiosks through their licensing program.*  Most of the kiosks are located in high-traffic areas, such as, office buildings, shopping malls, and retail stores. Revenue is generated by selling pre-paid membership cards, charging licensing fees and providing advertising. [Emphases added.]

19

49.    The third-quarter 2012 Form 10-Q stated revenues of $1.74 million, gross profit of $960,789, general and administrative expenses of $4,095,442, losses from continuing operations of $4,784,088, and a net loss of $4,951,273.

50.    The third-quarter 2012 Form 10-Q was signed by Defendants Spencer and Busshaus.  Attached to the Form 10-Q was a certification by Spencer and Busshaus under the Sarbanes-Oxley Act attesting to the accuracy of the Form 10-Q.

51.    On March 18, 2013, Defendants caused the Company to state, in its Form 10-K disclosing 2012 annual results, that the DEI had installed some 12,500 kiosks in 40 cities across China.  In addition, Defendants caused FAB Universal to state that:

> We believe our business of selling and distributing *copyright protected media* and content in China will continue to grow and generate profits due to the brand recognition of FAB in China as well as the continued support of the government for *copyright protection in China*.

> \*   \*   \*

> The FAB Intelligent Media Kiosks have greatly enhanced consumer ease-of-purchase *while reducing the appeal of pirated content*, positively *transforming market dynamics in China for legitimate content* and facilitating licensing opportunities with traditional media publishers who desire safe access to the world's largest, fastest-growing consumer market.  In addition to media content terminals, FAB's kiosk technology also addresses the specific needs of banks, supermarkets, shopping malls, office buildings, government offices, tourist resorts, university campuses and libraries and provides a foundation for the building of intelligent digital cities of the future.  [Emphases added.]

52.    The 2012 Form 10-K stated revenues of $27.5 million, gross profit of $11.0 million, general and administrative expenses of $8.5 million, losses from continuing operations of $2.75 million, and a net loss of $4.0 million.

53.    The 2012 Form 10-K was signed by Defendants Spencer and Busshaus.  Attached to the Form 10-K was a certification by Spencer and Busshaus under the Sarbanes-Oxley Act attesting to the accuracy of the Form 10-K.

54.     In April 2013, FAB issued RMB 100 million ($16.4 million) in corporate bonds to Chinese investors (the "Chinese Bond Issuance"). The issuance was accomplished through one of the PRC-incorporated subsidiaries of DEI, Beijing FAB Digital Entertainment Products Co., Ltd. ("FAB Digital") The Chinese Bond Issuance was not disclosed to Company shareholders in any of FAB Universal's SEC filings, press releases, or any other communications.

55.     On May 14, 2013, Defendants caused the Company to issue its Form 10-Q reporting first-quarter financial results for 2013. In this report, Defendants stated that DEI had installed over 13,800 kiosks in 40 cities in China. Defendants also reaffirmed that all content was fully licensed and consistent with copyright protections:

> We believe our business of selling and distributing *copyright protected* media and content in China will continue to grow and generate profits due to the brand recognition of FAB in China as well as the *continued support of the government for copyright protection in China.*

>                                  *   *   *

> FAB has quickly grown its nationwide business network through its license and regional agent programs and to date has expanded to *40 cities with around 10,000 licensees and an <u>installed</u> network count over 13,800 Intelligent Media Kiosks.* [Emphases added.]

56.     The first-quarter 2013 Form 10-Q stated revenues of $22.6 million, gross profit of $8.37 million, general and administrative expenses of $2.6 million, income from continuing operations of $4.26 million, and net income of $3.0 million.

57.     The first-quarter 2013 Form 10-Q was signed by Defendants Spencer and Busshaus. Attached to the Form 10-Q was a certification by Spencer under the Sarbanes-Oxley Act attesting to the accuracy of the Form 10-Q.

58.    On May 16, 2013, Defendants caused FAB Universal to issue its proxy statement for 2013 on Form 14A with the SEC ("2013 Proxy Statement"). The 2013 Proxy Statement was signed by Defendants Spencer and Polinsky. In it, the Audit Committee issued a signed report, stating, among other things:

> In reliance on the reviews and discussions referred to above, the *Audit Committee recommended to the Board, and the Board approved, that the audited consolidated financial statements and management's assessment of the effectiveness of our internal control over financial reporting*, together with Friedman' report, *be included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2012 filed with the SEC*. The committee and the Board also have recommended, subject to stockholder approval, the selection of Friedman LLP to audit our 2013 consolidated financial statements.
>
> Audit Committee
> Douglas Polinsky, Chairman
> J. Gregory Smith
> Denis Yevstifeyev

(Emphases added.)

59.    On August 2, 2013, a public announcement was made, via the website of the Shenzhen Stock Exchange, that FAB Digital had conducted the Chinese Bond Offering. Neither this announcement nor the Chinese Bond Issuance was not disclosed to Company shareholders in any of FAB Universal's SEC filings.

60.    On August 14, 2013, Defendants caused the Company to issue its Form 10-Q for the second quarter of 2013. In this filing, Defendants represented that DEI had installed approximately 16,000 kiosks in 40 cities in China, and repeated similar licensing and copyright integrity statements:

> We believe our business of selling and distributing *copyright protected* media and content in China will continue to grow and generate profits due to the brand recognition of FAB in China as well as the *continued support of the government for copyright protection in China.*

\* \* \*

FAB has quickly grown its nationwide business network through its license and regional agent programs and to date has expanded to over *40 cities and now has an __installed__ network base approaching 16,000 Intelligent Media Kiosks*. [Emphases added.]

61.    The second-quarter 2013 Form 10-Q stated revenues of $25.86 million, gross profit of $11.5 million, general and administrative expenses of $2.5 million, income from continuing operations of $7.45 million, and net income of $5.7 million

62.    The second-quarter 2013 Form 10-Q was signed by Defendants Spencer and Busshaus.  Attached to the Form 10-Q was a certification by Spencer and Busshaus under the Sarbanes-Oxley Act attesting to the accuracy of the Form 10-Q.

63.    In the Company's Form 10-Q for the third quarter of 2013, dated November 14, 2013, Defendants caused FAB Universal to claim that "FAB has quickly grown its nationwide business network through its license and regional agent programs and to date has expanded to over 40 cities and now has an __installed__ *network base in excess of 16,000 Intelligent Media Kiosks*."

64.    The third-quarter 2013 Form 10-Q stated revenues of $29.75 million, gross profit of $14.1 million, general and administrative expenses of $3.0 million, income from continuing operations of $7.3 million, and net income of $7.3 million

65.    The third-quarter 2013 Form 10-Q was signed by Defendants Spencer and Busshaus.  Attached to the Form 10-Q was a certification by Spencer and Busshaus under the Sarbanes-Oxley Act attesting to the accuracy of the Form 10-Q.

66.    On November 14, 2013, Defendants caused FAB Universal to issue its Form 10-Q reporting quarterly results for the third quarter of 2013.  In this filing, Defendants represented as follows:

We believe our business of selling and distributing *copyright protected* media and content in China will continue to grow and generate profits due to the brand recognition of FAB in China as well as the *continued support of the government for copyright protection in China.*

\* \* \*

FAB has quickly grown its nationwide business network through its license and regional agent programs and to date has expanded to *over 40 cities and now has an installed network base in excess of 16,000 Intelligent Media Kiosks.* [Emphases added.]

67.     In addition, the Form 10-Q stated that FAB Universal had achieved $26 million in revenue for the nine months ended September 30, 2013.

68.     The disclosures of Defendants set forth above were materially false and misleading in that they concealed and failed to disclose the facts that:  (a) the content being delivered to customers in China at the "kiosks" and elsewhere was, in fact, predominately pirated and illegitimate; (b) the number of "kiosks" actually being manufactured for DEI, and subsequently "installed" or "deployed" in China, was only a tiny fraction (no more than a couple of thousand) of the number claimed to be fully functional and operating; (c) FAB Digital had conducted an offering of bonds to Chinese investors through the Chinese Bond Offering; (d) kiosk franchisees did not and could not expect to achieve profits based on ongoing download sales but, rather, would be incented by the sale of Company stock, further diluting FAB Universal's existing shareholders; and (e) that the Company's revenues, gross profit, operating income, and net income throughout the relevant period had been drastically overstated.

## THE TRUTH EMERGES

69.     On November 14, 2013, Alfred Little (*alfredlittle.com*), an investment website which monitors and analyzes Chinese companies, published a report entitled "FAB Universal:

'Best Buy Meets iTunes Meets Redbox' Meets FRAUD." The report was also widely disseminated on the popular *Seeking Alpha* website.

70.     In this report, Alfred Little revealed that Defendants' statements concerning its actual financial performance and business prospects had been flagrantly overstated.

71.     In particular, according to Alfred Little:

1.   Contrary to FAB's anti-piracy claims, *FAB's "Intelligent Media Kiosks" are in reality loaded with very obviously pirated U.S. movies*;
2.   FAB's kiosk manufacturers acknowledged that:
     a.)   They historically supplied around 1,600-1,700 kiosks to FAB, *only 10% of the 16,820 units FAB claims to have deployed.*
     b.)   One kiosk supplier helped FAB stage *phony manufacturer site visits for FAB's investors* . . . .
3.   FAB's director of franchisee sales acknowledged that:
     a.)   FAB has *only around 1000 kiosks in Beijing* (compared to 3,954 disclosed in the 6/1/12 proxy); and
     b.)   FAB *promises kiosk franchisees guaranteed minimum returns* on their investments and *offers to buy back the franchised kiosks using FAB U.S. listed common stock.*

Based on the interviews and evidence that I collected, I conclude that *FAB's business in China is a tiny fraction of what it claims in its SEC filings*. FAB's actual profitability would be reduced even further if the company upgraded its pirated content to properly licensed content (assuming that is even possible). Finally, FAB has potentially enormous undisclosed liabilities for guaranteeing minimum investment returns to franchisees and undisclosed potential dilution from common stock issuable to franchisees. [Emphases added.]

72.     Importantly, the Alfred Little report disclosed that, notwithstanding claims that upwards of 16,000 kiosks had been "installed" or "deployed" throughout China, there was evidence that only 10% of this number—only approximately 1,6000 units—*were even in existence.*

73.     Focusing on one kiosk in Beijing, Alfred Little noted the following videos available for download. Based on the "file creation date" available by inspecting the downloaded file, Alfred Little was able to infer that many of the titles had been created simply

by filming movie theater presentations of the content. Moreover, because the files had been created before the movie's official release date in digital format, the titles were obviously pirated:

| Movie Title | FAB Movie Release Date | Studio DVD Release Date |
|---|---|---|
| The English Teacher | | 9/3/13 |
| Stoker | 6/9/13 | 6/18/13 |
| The Place Beyond the Pines | 6/9/13 | 8/6/13 |
| Vehicle 19 | 6/9/13 | 7/23/13 |
| Jack the Giant Slayer | 6/9/13 | 10/1/13 |
| Phantom | | 6/25/13 |
| Gayby | 6/19/13 | 12/11/12 |
| Aftershock | | 8/6/13 |
| The Call | | 6/25/13 |
| Tom and Jerry's Giant Adventure | 7/3/13 | 8/6/13 |
| The Urge | 7/5/13 | 10/8/13 |
| Silent Hill: Revelation 3D | 10/26/12 | 2/12/13 |
| Skyfall | 1/21/13 | 2/12/13 |
| Dark Skies | 5/22/13 | 5/28/13 |
| Truth or Dare | 5/15/13 | 8/27/12 |
| The Host | 4/25/13 | 7/9/13 |
| Broken City | 4/25/13 | 4/30/13 |
| Spiders | 4/25/13 | 3/12/13 |
| Paranormal Movie | 4/25/13 | 4/9/13 |
| The Haunting in Connecticut 2 | 4/25/13 | 4/16/13 |
| The Numbers Station | 4/25/13 | 5/28/13 |
| A Haunted House | 4/25/13 | 4/23/13 |
| Pawn | 4/25/13 | 4/23/13 |
| Fright Night | 9/2/11 | 12/31/11 |
| Gambit | 11/21/12 | 9/18/13 |

| Argo | 10/22/12 | 2/19/13 |
| The Life of Pi | 11/22/12 | 3/12/13 |

74.  Based on Alfred Little's disclosures, the Company's stock price fell to $5.25 per share on November 14, 2013—a decline of approximately 4% on extremely heavy volume.

75.  In reaction to the Alfred Little report, Defendants caused FAB Universal to deny the claims outright.  In a press release aggressively entitled "FAB Universal to Respond to Misleading and Inaccurate Allegations from Alfred Little," Defendants stated on November 15, 2013 as follows

> FAB Universal (NYSE MKT: FU), ("FAB" or "Company") a worldwide distributor of digital media and entertainment, today *denied the misleading and inaccurate allegations* made in a recent report published by Alfred Little. The Company announced that it would, as soon as possible, issue a public statement to refute these defamatory remarks and that it expected to be in a position to provide a response shortly.  [Emphasis added.]

76.  Five days later, however—in a vain attempt to maintain the Company's stock price, artificially inflated by their own deceptions—Defendants could muster only the following "refutation":

> FAB Universal (NYSE MKT:FU), a worldwide distributor of digital media and entertainment, repeated today its *vehement denial of the recent allegations raised by short-sellers* in their self-serving "reports" and reaffirmed its commitment to providing the Company's shareholders with accurate information. FAB's Board of Directors is working expeditiously to gather all the relevant information necessary to respond to these misleading and inaccurate reports in an appropriate manner and to report back to its shareholders as quickly as possible.

77.  In the mean time, another resourceful commentator had uncovered the facts concerning Defendants' secret Chinese Bond Offering.  Thus, on November 18, 2013, GeoInvesting issued a report disclosing the existence of the Chinese Bond Offering and noting that its existence had consistently been withheld from Defendants' SEC filings.  GeoInvesting relied on the following evidence:

- A public announcement regarding the bond offering was posted on August 2, 2013 on the official website of the Shenzhen Stock Exchange.

- Wind Info, China's leading financial data provider (the Chinese Bloomberg), disclosed information about the bond offering.

- An asset management report shows that a mutual fund sponsored by China's Daton Securities owns 20,000,000 RMB of the FU bonds.

78.     In response to this report, FAB Universal's stock price dropped another $0.89 per share, to close at $4.40 per share on November 18, 2013—a decline of approximately 16% in a single day.  The share volume was exceptionally heavy, at 16 million shares.

79.     On November 19, 2013, Alfred Little issued a follow-up report, noting that every single one of the obviously pirated titles noted in the previous report had mysteriously been removed from the display cases in the affected kiosks in Beijing.  Alfred Little reported that staff members at the kiosk in question "explained that due to anti-piracy concerns in China, FAB had recently removed all the U.S. movies from its kiosks, claiming that FAB's 'copyright licenses had expired.'"

80.     On December 10, 2013, FAB Universal issued a Form 8-K with the SEC disclosing that "the Company's unaudited interim consolidated financial statements as of June 30, 2013 and September 30, 2013, and for the quarters then ended . . . should no longer be relied upon."

81.     The Form 8-K went on to state:

As a result of the determination that one subsidiary of the Company's variable interest entity (VIE), entered into a $16.3 million bond offering in China (the "China Bond Offering") which was not reflected on the 2013 Interim Financial Statements as a result of the failure to report such financing in accordance with the Company's internal control over financial reporting procedures, the Audit Committee of the Company's Board of Directors determined (following discussion with the Company's independent accountants) that it was necessary to have the 2013 Interim Financial Statements included in the Company's Quarterly Reports on Form 10-Q for the quarters ended June 30, 2013 and September 30, 2013, to be restated to reflect the effects of the China Bond Offering.  While the

Company is still in the process of preparing such restated unaudited interim financial statements, its preliminary estimates indicate that the effect of the error was to underreport net interest expense and net income by approximately $344,000 in the three month period ended June 30, 2013 and approximately $476,000 in the three month period ended September 30, 2013, resulting in an overstatement in net income per share of $0.02 for the three months ended June 30, 2013, $0.01 for the six months ended June 30, 2013; $0.02 per share for the three months ended September 30, 2013 and $0.04 per share for the nine months ended September 30, 2013. The Company also estimates the restated unaudited interim financial statements will reflect an increase in cash of approximately $15.8 million, long term debt of approximately $16.3 million and deferred financing costs of approximately $459,000 and $419,000 as of the end of each respective period. Each of the foregoing estimates is subject to the finalization of the restated unaudited interim financial statements, to which the Company directs investors for disclosure regarding the error and its impact on its results of operation and financial position.

82.    Subsequently, on January 21, 2014, the Company was required to reissue amended Forms 10-Q for the second and third quarters of 2013.

83.    On December 10, 2013, Defendants caused FAB Universal to offer yet another "refutation" of the Alfred Little revelations, couched as the announcement of a supposedly "independent third-party review" of the situation. By its terms, this communication establishes merely that the Board has prejudged the issue of Defendants' false statements and, after a suitable interval, will simply reaffirm those statements. In addition, Defendants have conceded that their own internal controls were inadequate. The press release states as follows:

**Board Authorizes Third Party Investigation to Verify its Finding**

PITTSBURGH, PA. December 10, 2013 — FAB Universal (NYSE MKT: FU), a worldwide distributor of digital media and entertainment, *announced today the findings of the preliminary internal review* undertaken at the direction of FAB's Board of Directors in response to the allegations made in numerous published reports through November 19, 2013 by acknowledged *short-sellers* of FAB's common stock.

The Board of Directors takes these allegations seriously and is aware that they have created doubt about FAB Universal and its business operations and financial reporting. The Board and its management team remain committed to providing the highest level of transparency in its financial reporting and maintaining the

trust of its shareholders. The management team has been working diligently to complete the preliminary internal review undertaken at the Board's request. As a result of the findings of this review, the Board has *uncovered certain deficiencies in the Company's internal controls*, and is taking the necessary steps to tighten FAB Universal's internal controls.

In recognition of the fact that the Board is relying on its own analysis of the allegations and to reassure the Company's shareholders of the integrity of its analysis, the Board has authorized the hiring of an independent third party to verify these findings. In addition, the Company plans to hire a bi-lingual Senior Financial Reporting Executive with public company experience to work at FAB Universal in Beijing. This individual will have responsibility for all FAB financial reporting in China.

## Bond Offering

It has been determined that *one of the Company's variable interest entities (VIE), conducted a $16.3 million bond offering in China which was not reflected on the Company's financials*. The Company *is taking steps to determine both how this occurred* and what controls are necessary to ensure that it does not happen again. Net proceeds from the bond offering totaled $15.8 million; however, to date none of the funds have been used by FAB Universal. The three year bonds were issued on April 25, 2013 in an aggregate principal amount of $16.3 million and bear interest at the rate of 11% per annum with an option to adjust the interest rate at the end of the second year. The bonds are secured by a pledge of all shares in an entity that does business with the Company and certain real estate assets in China, and are guaranteed by FAB Universal's Chairman Zhang Hongcheng. The bonds are puttable by the holders at the end of the second year.

While FAB Universal intends to restate its financial statements for the second and third quarters of 2013, it is important to note that neither the proceeds of the offering nor the liability were reflected on the Company's financial statements. The Company's financial statements will be impacted for the net interest expense and deferred financing costs associated with the bond offering. The Company will file an 8-K later today advising investors to no longer rely on the Company's unaudited financial statements for the second and third quarters of 2013 and presenting the Company's preliminary estimates of the effect of the bond offering.

## Kiosks

The *short sellers provide anecdotal evidence* to suggest that the number of Intelligent Media kiosks licensed by FAB is far lower than publicly reported. *The short sellers have a fundamental, but understandable, misunderstanding of the economics of the Company's business. FAB does not buy, sell or own kiosks.*

Instead, it sells licenses to operate Intelligent Media kiosks and to use the software to run the kiosks through 40 independent regional agents who are responsible for signing up licensees, deploying the kiosks and reporting the number of installed kiosks.

As of September 30, 2013, 16,820 *licenses* have been sold, of which 3,954 have been issued for the placement of kiosks in Beijing; all of the 3,954 kiosks in Beijing have been deployed. As part of its preliminary review, the Board has examined data concerning the licenses to operate kiosks entered into by the Company as of September 30, 2013, and has *re-verified* 12,866 [out of approximately 16,000] *licenses*. Verification of the remaining licenses will continue until all licenses have been reviewed.

## Minimum Guarantee

It has been alleged that FAB promises kiosk licensees guaranteed minimum returns on their kiosk investments and offers to buy back kiosks using FAB's U.S. listed common stock. To date, the Company has completed a review of 75% of the license contracts and has not identified any instances of a minimum guarantee. FAB maintains that it has never entered into any agreement with an agent or licensee for a minimum return guarantee or stock payment by the Company. Any communication to the contrary was unauthorized and is unenforceable.

## Pirated Content

One of the short sellers' allegations centers on the claim that the Company's Intelligent Media kiosks have been distributing pirated U.S. movies. FAB Universal takes great pride in its commitment to copyright protection and has never authorized the installation of any pirated content. To ensure compliance with its policies regarding piracy, the Company will examine its content control processes with the assistance of the independent third party and implement any measures deemed necessary to tighten controls.

## New Retail Store Prepayments

As part of its review, the Board of Directors has asked that $17.8 million in prepayments for the setup of additional FAB flagship stores be returned to the Company in light of its decision to accelerate the transition to digital distribution channels. These are cash payments that FAB has made to third parties to assist the Company in opening multiple retail flagship stores throughout China. Of the total $21.2 million in prepayments on the Company's balance sheet as of September 30, 2013, $3.4 million of prepayments will remain outstanding which will be used to open 2 retail stores in 2014.

## Cash